LONG ISLAND R. CO. v. DARNELL (two cases).

(Circuit Court of Appeals, Second Circuit. February 9, 1915.)

Nos. 149, 150.

1. NEGLIGENCE ⬥⟶92—CONTRIBUTORY NEGLIGENCE—IMPUTED NEGLIGENCE—TAXICAB DRIVER.

The contributory negligence of a taxicab driver cannot be attributed to one riding in the cab when it was struck by a railroad train at a street crossing.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 142–146; Dec. Dig. ⬥⟶92.]

2. NEGLIGENCE ⬥⟶117—ACTIONS—PLEADING—CONTRIBUTORY NEGLIGENCE.

While contributory negligence is a defense, it may be relied on by defendant without being specially pleaded.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 195–197; Dec. Dig. ⬥⟶117.]

3. APPEAL AND ERROR ⬥⟶1066—HARMLESS ERROR—INSTRUCTIONS.

Error in charging the jury that contributory negligence could not be relied on unless pleaded was harmless, where there was no evidence of contributory negligence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4220; Dec. Dig. ⬥⟶1066.]

4. WITNESSES ⬥⟶236—EXAMINATION—HEARING SOUNDS.

In an action for injuries received in a grade crossing accident, it was error to permit witnesses for plaintiff, who had testified that they did not hear the whistle or bell sounded, to answer a question whether they had heard the whistle and bell on previous occasions when they were in the same rooms, where the question did not also include the conditions of storm and engaged attention which prevailed at the time in question.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 817–826; Dec. Dig. ⬥⟶236.]

5. EVIDENCE ⬥⟶586—WEIGHT—NEGATIVE EVIDENCE—SOUND.

Statements of witnesses that they did not hear sounds are negative testimony and must be weighed with caution.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2432–2435; Dec. Dig. ⬥⟶586.]

6. TRIAL ⬥⟶235—INSTRUCTIONS—WEIGHT OF EVIDENCE—POSITIVE AND NEGATIVE TESTIMONY.

In an action for injuries received in a grade crossing accident, where there was positive testimony by witnesses for defendant that the sound signals were given, and testimony by witnesses for plaintiff that they did not hear such signals, it was error for the court, when requested by defendant to charge that, as against positive affirmative evidence by credible

⬥⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

witnesses as to the ringing of the bell or sounding of the whistle, there must be more than mere testimony of witnesses that they did not hear the signals, and that it must appear that they were looking, watching, and listening for them, and that their attention was directed to them. to state that he declined to charge that as a whole, and that the testimony of those in the courtroom, although their attention was not directed to it, that a gun had not been fired therein, would outweigh the testimony of one who said it had been fired, and would be sufficient to convict him of perjury, since, though some qualification of the request would have been proper, the illustration used was so remote that it probably misled the jury as to the relative weight of positive and negative testimony.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 539–541, 543–548, 551; Dec. Dig. ☞235.]

**7. RAILROADS ☞316—ACCIDENTS AT CROSSING—NEGLIGENCE—SPEED.**

A railroad is not negligent for operating its train at a speed permitted by a village ordinance, if it observes all the precautions to give warning by sounding the whistle and bell as required by statute, and by having the crossing gong and flagman at the crossing to give the warnings upon which travelers have become accustomed to rely.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1006–1008, 1011, 1012; Dec. Dig. ☞316.]

Duty to give warning signals at crossing, see note to Chesapeake & O. Ry. Co. v. Steele, 29 C. C. A. 90.]

**8. RAILROADS ☞351—ACCIDENTS AT CROSSING—INSTRUCTIONS—NEGLIGENCE.**

Where the court, in an action for injuries received at a grade crossing, had stated in the charge that plaintiff claimed that under the circumstances it was negligence for defendant to operate its train through the village at the speed shown, though it was within the speed limit, and that it was its duty to be on the lookout for people or vehicles on the crossing, and to use reasonable care in a place of that size to have its train under control at a reasonable and suitable distance from the crossing, the jury might have understood that plaintiff could have recovered for excessive speed alone, though the court gave a modified request that they could not impute negligence to the railroad because of speed alone, but that speed might be considered with other things and conditions.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1193–1211, 1213–1215; Dec. Dig. ☞351.]

In Error to the District Court of the United States for the Southern District of New York.

These causes come here upon writs of error to review judgments of the District Court, Southern District of New York, in favor of defendants in error who were plaintiffs below. The first action is for personal injuries sustained by Pauline Darnell who will be hereinafter referred to as the plaintiff; the second, for loss of services and necessary disbursements resulting from such injuries. The injuries resulted from collision with a train of defendant's railroad at Freeport, L. I., on October 1, 1911. The facts are sufficiently set forth in the opinion.

Joseph F. Keany, of New York City (John J. Graham and Henry A. Uterhart, both of New York City, of counsel), for plaintiff in error.

Taylor & Thurber, of New York City (Burt L. Rich, of New York City, William P. Metcalf, and Raymond D. Thurber, of New York City, of counsel), for defendants in error.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

LACOMBE, Circuit Judge. At Freeport the railroad runs east and west, with station located about half way between Main street and Grove street; the two streets being about 600 feet apart. Both streets cross the railroad from south to north. Plaintiff, with her mother and sister and the witness Collier, were in a taxicab; the three ladies on the rear seat, Collier on the right-hand collapsible seat facing west. Mott, the chauffeur, was alone on the left-hand side of the front seat. They were moving north on Grove street, intending to cross the tracks and go to the north station platform, where the ladies were to take a westbound local train due at 7:08 p. m. It was raining hard, with a high wind from southeast. As one proceeds north along Grove street towards the crossing, the view to the east is at first obstructed; but when a point is reached 100 feet south of the crossing the view to the east for a considerable distance beyond the station is wholly unobstructed, except by a low picket fence between east and west bound tracks. The chauffeur and the witness Collier, who lived in Freeport, were familiar with the locality.

The taxicab proceeded along Grove street onto the crossing, where it was struck by a west-bound express running at a speed variously estimated at from 25 to 35 miles an hour. There were no gates at the crossing; the statute did not require them. The first subject to be considered is what precautions were taken generally by the railroad company to protect persons using the crossing. The statute required a whistle to be blown on the engine at a specified distance east of the crossing; the engine was equipped with a whistle in good order. The statute also required that at a specified distance east of the crossing the engine bell should begin ringing; the engine was equipped with an automatic bell, and when started it would continue to ring until stopped. In addition to these statutory precautions, the railroad had installed a gong on the west side of the crossing. The gong was electrically connected with the track. At a point 2,000 feet or more east of the crossing a contact spring would set it ringing, and when set ringing it would continue to do so for four minutes. Persons familiar with the locality knew of the gong, and, no doubt, were accustomed to rely upon it as a warning of approaching trains. The railroad had also stationed a flagman at the crossing between some hour in the morning and 7 p. m. He was still on duty when this accident happened. It had supplied him with a shanty or shelter in which he could remain when his services were not required. He was not stationed there to warn persons about to cross, but to notify approaching trains whether or not the track was clear. After dark (as it was then) he carried a lantern, which he was to move up and down to indicate a clear track, and from side to side to indicate danger. Persons familiar with the locality knew of his presence on the track when trains were approaching, and, no doubt, relied to some extent on his presence or absence as indicating the approach or nonapproach of a train. The headlight of the express was burning and its cars lit up. To any one approaching the crossing from a point 100 feet south until the track is reached there was nothing to obstruct the view of a train approaching from the east, except such obscuration as rain driving on the glass of the window behind him would interpose to the vision of Collier.

221 F.—13

The chauffeur, Mott, testified that when he got about 50 or 60 feet from the track he put his car into low speed and continued on at about 7 miles an hour, looking in both directions, but saw no lights, except those at the station. That until he was struck, although constantly looking in both directions, he did not see the train nor hear it; nor did he hear any whistle, nor engine bell, nor crossing gong; nor did he see the flagman. Collier testified that when about 100 feet from the crossing he seemed to hear a roar that sounded like a train, and asked the chauffeur if it was the 7:08 train; that he heard no whistle or bell; and that, although listening for the gong and looking for the flagman, he did not hear the one or see the other.

Two other witnesses for plaintiff, who will be referred to later, testified that they did not hear the whistle. Another witness for the plaintiff, who was standing on the platform waiting for the 7:08 train, heard a whistle to the east and thought it was his train. He turned and looked towards it, and saw it coming all lit up; knew it was not his train, as it went past him with a crash and a roar. When it was as far east of him as Main street, he could hear the noise it made.

Several witnesses were called by defendant, some in the employ of the railroad company. From their several narratives it would appear that the whistle was sounded at the proper place, that the engine bell began to ring at the proper place and continued ringing until collision, that the gong was set in motion as usual and continued sounding for four minutes, and that the flagman was on the crossing signaling the train with his lantern and was seen doing so.

[1] Contributory neglience on the part of the chauffeur cannot be attributed to plaintiff. If the defendant also was negligent, and its negligence contributed to the accident, plaintiff can recover. There was no error, in view of the conflicting testimony, in sending the cause to the jury. Defendant, however, insists that it was prejudiced by the admission of testimony and by some instructions given to the jury.

[2, 3] The court charged the jury that any question of plaintiff's contributory negligence was out of the case, because it had not been pleaded, instructing them that in the United States courts contributory negligence of a plaintiff could not be proved unless it was alleged in the answer. Exception was duly reserved. This was error. The rule in this circuit was laid down by this court in Canadian Pacific Ry. v. Clark, 73 Fed. 76, 20 C. C. A. 447; Id., 74 Fed. 362, 20 C. C. A. 447. Contributory negligence is a defense, the burden of proving which is on the defendant; but it is a defense which defendant can avail of without pleading it. This error, however, was harmless, because there is nothing in this record which would support a finding that plaintiff was herself negligent in any way.

[4] Plaintiff called one Randell, who lived in the nearest house to the corner of the crossing, on the east side of Grove street, from 150 to 180 feet north of the track. On the occasion in question he heard the rumble of the train, but did not hear the whistle blown before the rumble. The door and windows were closed, and he was engaged in conversation with his family and a young man who was there, paying no attention whatever to the passage of the train. Over objection and exception he was allowed to answer "Yes" to the question:

"Has he ever noticed, as he has been in that room before this accident, had he ever noticed whether or not he could hear trains approaching, the signals they gave, whistles or bell?"

Over like objection and exception to the further question whether on previous occasions he did hear them, he answered "Yes." This was error, because it was not shown that the circumstances were the same. The door and windows might have been open on the prior occasions, and he might have been listening for the train, expecting some friend would arrive on it. A proper question would have been:

"Can you recall any occasions when you heard the whistle and bell of a train approaching from the east, when you were in the same room with door and windows closed, a rainstorm with high wind prevailing, and yourself engaged in conversation, or in writing, or in reading, or with your attention otherwise occupied?"

The error might be held harmless, had it not been for the instructions to the jury on the subject of negative testimony.

Another witness for plaintiff, the chief of police, was in the station house located 40 feet south of the depot and 200 feet west of Grove street. He was engaged in writing a report and did not hear the whistle. He also, over objection and exception, was allowed to testify that on previous occasions he had heard the whistle when he was in that room, without confining him to occasions like this, when his attention was engaged in some way, and when there was a storm, with wind from the southeast, which would tend to carry the sound away from the station house.

[5, 6] Negative testimony as to sounds—that is, the statements of witnesses that they did not hear the sounds—must always be weighed with caution. Defendant, therefore, asked the court to charge:

"As against positive affirmative evidence by credible witnesses as to the ringing of the bell or the sounding of the whistle, there must be something more than the testimony of one or more witnesses that they did not hear it. It must appear that they were looking, watching, and listening for it; that their attention was directed to the fact. A mere 'I did not hear' is entitled to no weight, in the presence of affirmative evidence that the signal was given."

To this the court said:

"That I decline to charge as a whole, just as it is written. Of course, 'I did not hear' is entitled to weight, if the person who says he did not hear was in a situation where he probably would have heard, and necessarily must have heard. Suppose one man swears that a gun was fired in this room two minutes ago. We were all here; we were not expecting a gun, had no reason to apprehend a gun, were not thinking anything about a gun; it was not in our minds. And still, if that man who happened to be in here should go outside, and go over into another branch of this court, and swear that five minutes ago a gun was fired in this room and that he heard it, the evidence of every one of us would be competent and proper to show that the gun was not fired here, and my judgment is that it would produce a finding of perjury against that man, because, while we were not watching for a gun, or expecting a gun, or thinking anything about a gun, it is extremely probable that, if one had been fired here, we would all have heard it."

Exceptions were reserved to the refusal to charge the request and to comment upon it. Some qualification of the request might properly have been made, but the illustration given to the jury was so very re-

mote from anything presented in the case on trial that it is highly probable they were misled as to the relative values of the positive and negative testimony they had to deal with, to the prejudice of the defendant.

[7] We think, too, the jury were misled as to the weight they should give to the speed of the train. The limit fixed by ordinance in this village was 40 miles an hour. There was no testimony to warrant a finding that this limit was exceeded. Estimates of the speed varied from 25 to 35 miles an hour. Of course, when running at that high speed over a crossing unprotected with gates, a railroad company is obligated to use a very high degree of care. The prescribed whistle must be sounded at the prescribed place; the engine bell must ring as the statute requires continuously; the gong put there by the company, and on whose sound it invited passers-by to rely as a warning, must have sounded; the flagman whose presence on the crossing with a lantern it required when a train was approaching (and on whose presence it thereby induced passers-by to rely) must be at his post. As to these four precautions there was conflicting evidence; but if the jury found they were all observed the railroad was not to be held negligent because its train was running fast, so long as it kept within the limit.

[8] When requests were being ruled on after the main charge, defendant asked for an instruction that the jury cannot "impute negligence to the defendant by reason of speed alone." To which the court replied:

"Speed alone, I say that is true; but the speed may be considered with other things and conditions."

If this were all the jury were told about speed, it would not be obnoxious to criticism; but it was not all. The court had told them a great deal about speed. This brief statement at the close, especially with its reference to "other things and conditions" would hardly be taken by them as qualifying the instructions already given them, on that subject, in the main charge. After describing the size of the village, and the number of persons who might be expected to be in the vicinity of the crossing in the evening, the court said (in the main charge):

"Plaintiff contends that in view of that situation, which was known to the railroad company, the railroad company was negligent in running this express train, through that village and over that crossing, at that time in the evening, after dark, in the storm, the darkness, and the wind which then prevailed at the (speed shown in the testimony). * * *"

Elsewhere:

"Plaintiff claims that to approach this crossing under such circumstances and surroundings, on such a night with the wind blowing, in that village, proceeding at that rate (nearly 40 miles an hour) was evidence of negligence in that regard; that it was negligence to imperil people who in the darkness and storm and rain might be using that crossing to proceed at such speed, and that it should have proceeded more slowly."

After referring to other branches of the case, the court again said:

"While this defendant had the right of way, it was its duty to apprehend that foot passengers or people in vehicles or automobiles might be at or even on the crossing, and hence be on the lookout, use reasonable care to have the train under control, the speed under control in such a place, of about some 5,000 to 7,000 people, whatever it is, reasonable and proper signals given of

its approach, either by bell or whistle or whistles, or even both, if circumstances and conditions demanded it, at a reasonable and suitable distance from the crossing."

We find it difficult to escape the conviction that the jury took this case with the understanding that, although the evidence might satisfy them that all four precautions had been observed—whistle, bell, gong, and flagman—and the speed limit were not exceeded, nevertheless they might hold the defendant negligent, if they thought the speed was such as not to leave the train under proper control in such a place. We think defendant was prejudiced thereby.

Judgment reversed.